

FILED
CHARLOTTE, NC

APR 23 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| **JOSEPH HURST,**<br><br>Plaintiff,<br><br>v.<br><br>**CENTRAL PIEDMONT COMMUNITY COLLEGE,**<br><br>Defendant. | Civil Action No.: 3:26-cv-320-MEO<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT FOR EMPLOYMENT DISCRIMINATION AND RELATED CLAIMS UNDER TITLE VII, 42 U.S.C. § 1981, AND 42 U.S.C. § 1983** |

Plaintiff Joseph Hurst ("Plaintiff"), proceeding pro se, brings this action against Defendant Central Piedmont Community College ("CPCC" or "Defendant") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983, and alleges as follows:

## I. NATURE OF THE ACTION

1. This is a civil action for damages and equitable relief arising from Defendant's unlawful discrimination against Plaintiff on the basis of his race (Black American descendant of Freedmen), its creation and maintenance of a hostile work environment, its unlawful retaliation against Plaintiff for engaging in protected activity, and the constructive discharge of Plaintiff resulting from conditions so intolerable that a reasonable person in Plaintiff's position would have felt compelled to resign.

2. Plaintiff, a Black employee, was promoted to a supervisory role over Shane Rogers, a White employee who had opposed Plaintiff's promotion. Following Plaintiff's promotion, Rogers challenged Plaintiff's authority and engaged in conduct that Plaintiff reported to Plaintiff's supervisor beginning in May 2025 and Human Resources on multiple occasions beginning in

June 2025. Despite these reports, Defendant did not authorize timely corrective action addressing Rogers' conduct. In contrast, complaints made against Plaintiff were accepted, investigated, and later encouraged and aggregated by Human Resources. The differential handling of complaints was not the product of a neutral institutional structure that scrutinizes supervisors more heavily than subordinates. Rogers was not merely a subordinate; he was a subordinate who had actively opposed Plaintiff's promotion, filed an HR complaint seeking Plaintiff's removal, and whose opposition Defendant's own CHRO later characterized as potential grounds for a retaliation claim against Plaintiff's department. Defendant's alignment with Rogers' resistance, and its asymmetric response to complaints for and against Plaintiff, reflected institutional support for Rogers' challenge to Plaintiff's authority rather than neutral complaint administration. This differential handling of complaints and enforcement of workplace standards, in the context of Plaintiff's supervisory role over a White subordinate who resisted Plaintiff's authority, supports a reasonable inference that Plaintiff was subjected to disparate treatment in the terms and conditions of his employment.

## II. JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein were committed in this district, Defendant operates within this district, and a substantial part of the events giving rise to Plaintiff's claims under both Title VII and 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983 occurred within this district.

5.     Plaintiff has exhausted all administrative remedies required prior to filing this action. Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). On January 27, 2026, the EEOC issued a Notice of Right to Sue to Plaintiff. This Complaint is filed within ninety (90) days of Plaintiff's receipt of that notice, as required by 42 U.S.C. § 2000e-5(f)(1). A copy of the Notice of Right to Sue is attached hereto as Exhibit A.

### III. PARTIES

6.     Plaintiff Joseph Hurst is a Black American man of Freedmen descent and a resident of Charlotte, Mecklenburg, North Carolina. At all relevant times, Plaintiff was employed by Defendant as Risk Management Analyst and later as Director of Enterprise Risk Management.

7.     Defendant Central Piedmont Community College is a public community college organized and operating under the laws of the State of North Carolina, with its principal place of business located in Charlotte, Mecklenburg County, North Carolina. At all relevant times, Defendant employed fifteen (15) or more employees and is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

### IV. STATEMENT OF FACTS

### A. Plaintiff's Hiring and Qualifications

8.     Plaintiff was hired by Defendant on October 17, 2024, as a Risk Management Analyst. Plaintiff has over twelve (12) years of professional experience in the risk management and insurance industry, along with a Master of Business Administration degree.

9.      At the time of hire, Plaintiff's supervisor was Executive Director of Enterprise Risk Management Felicia Waugh. Plaintiff's coworker, Shane Rogers, served as a peer Risk Management Analyst and was present on Plaintiff's interview panel for the Risk Management Analyst role. Rogers was therefore fully aware of Plaintiff's qualifications and experience at the time of Plaintiff's hire as Risk Management Analyst and at the time of Plaintiff's promotion to Director.

10.     Rogers does not have comparable professional experience in risk management or insurance. During their time as coworkers, Rogers regularly relied on Plaintiff's expertise to perform his own work duties.

## B. Plaintiff's Promotion and the Immediate Discriminatory Response

11.     Following the resignation of Executive Director Felicia Waugh, Defendant reclassified and posted the position as Director of Enterprise Risk Management. Plaintiff, Rogers, and a third colleague, Davious Lee (Black), all applied for the position and separately completed a panel interview.

12.     On May 15, 2025, Associate Vice President of Financial Services Bruce Cole (White) notified Plaintiff that he had been selected for the Director position. Cole reports to Vice President of Finance and Facilities Operations Jessica Boyce (White). Plaintiff reported to Cole.

13.     Despite the position not being posted or designated as interim, Cole informed Plaintiff that HR had decided that the position would be "Interim" so that the leadership of HR could evaluate whether Plaintiff was a good fit before formally placing him in the role. No such condition was imposed upon White employees in the College, and interim positions are not a customary practice for the Defendant. Upon information and belief, no comparable interim

designation was imposed on White employees promoted to director-level or equivalent supervisory roles within Defendant's organization during the relevant period. The condition's removal immediately upon Plaintiff questioning its application to him further supports the inference that it was not grounded in legitimate institutional policy but was instead a condition applied to Plaintiff because of his race. Plaintiff expects that discovery will establish the absence of any comparable condition imposed on similarly situated White employees. The condition of "Interim" was removed once Plaintiff questioned its application to him.

14.     Cole further informed Plaintiff that the leadership of Human Resources had questioned Cole's decision to promote Plaintiff and urged him to reconsider selecting Plaintiff for the Director role over Rogers. Cole also told Plaintiff that "it would be a rough road ahead" for Plaintiff because Rogers would not take the news well. Cole's statement placed Defendant on constructive notice, prior to the commencement of Rogers' hostile conduct, that Rogers posed a foreseeable risk to Plaintiff's working environment. Defendant's subsequent failure to take prompt remedial action despite this advance awareness further supports Plaintiff's hostile work environment and disparate treatment claims.

15.     On May 20, 2025, Cole notified Rogers and Lee of Plaintiff's selection. Cole informed Plaintiff that Rogers had an outburst in Cole's office upon learning of the decision.

16.     In the days following the announcement, Rogers' behavior toward Plaintiff changed dramatically. He began slamming office doors, refused to speak to Plaintiff, stomped around the office, and exhibited hostile body language. Plaintiff reported Rogers' conduct to Cole. Cole told Plaintiff to allow Rogers time to "come around" and stated he would address Rogers' behavior if it did not improve.

17.     On May 30, 2025, upon Rogers' request, Plaintiff conducted a one-on-one with Rogers to reestablish and reaffirm Plaintiff's working relationship with Rogers. During this one-on-one, Rogers affirmed that Plaintiff had built a positive working relationship with Rogers and others throughout Plaintiff's tenure. Nonetheless, Rogers continued to be insubordinate.

## C. Defendant's Failure to Remedy Hostile Work Environment

18.     Between May 2025 and October 2025, Plaintiff repeatedly reported Rogers' hostile and insubordinate conduct to Cole and to Human Resources Representative Cynthia Mayhan (Black). Despite these reports, Defendant failed to take or allow prompt, effective action.

19.     Throughout his tenure as Director, Plaintiff followed every institutional procedure and utilized every management process available to him to address Rogers' conduct and to fulfill his responsibilities as Director. Plaintiff documented Rogers' insubordination in writing. Plaintiff met with HR, submitted written responses, and provided supporting documentation when requested. Plaintiff reiterated departmental expectations formally on multiple occasions. Plaintiff reported concerns through his chain of command. Despite these efforts, Plaintiff did not receive timely or effective support from Defendant. At every stage Plaintiff was either redirected, delayed, or denied the institutional support that his role as Director required and that Defendant's own personnel policies outlined.

20.     On June 6, 2025, Plaintiff sent an email to Human Resources documenting the hostile work environment created by Rogers' conduct following his promotion. Plaintiff met with Mayhan on June 12, 2025, and was instructed merely to continue setting expectations and working within his chain of command.

21. No investigation was conducted by Defendant in response to Plaintiff's June 6, 2025, complaint to HR and Plaintiff was given no substantive solution. Plaintiff was repeatedly redirected between HR and Cole in a manner that constituted a runaround.

22. On June 16, 2025, Rogers notified Plaintiff that he would be taking FMLA leave from June 23, 2025, through August 22, 2025.

23. During Rogers' FMLA leave, Plaintiff sought to fill the Risk Management Analyst vacancy created when he assumed the Director role. Cole declined to authorize Plaintiff to proceed with the hiring process for the vacancy, stating that any major department plans for Plaintiff's department would be placed on hold until it was known whether Rogers would return from FMLA. Rogers' leave did not create the vacancy in Plaintiff's department; his leave merely compounded the staffing burden created by Plaintiff's promotion while simultaneously being used as the stated justification for freezing the hiring process. Rogers returned from FMLA leave on August 25, 2025. Despite Rogers' return, the hiring restriction persisted for approximately three additional months, until November 2025. The restriction deprived Plaintiff of the ability to staff his department during a critical period of his tenure as Director, limited the functionality of Plaintiff's department, caused Plaintiff's remaining staff member, Lee, to absorb unsustainable workloads, and further undermined Plaintiff's functional authority as Director. Rather than allowing Plaintiff the opportunity to stabilize the department under Plaintiff's new leadership, Defendant used the uncertainty of Rogers' return from FMLA as a basis to further restrict Plaintiff's authority as Director. The use of Rogers' FMLA leave as a justification for restricting Plaintiff's hiring authority was pretextual. No legitimate operational reason existed to freeze hiring for a vacant position during a subordinate's temporary leave, and no comparable

restriction was imposed on White directors or supervisors within the College under similar circumstances.

24.     During the same period, Lee requested permanent compensation adjustment because of his sustained increased workload. Lee had previously been promised a compensation adjustment by Waugh, but it was never implemented before her departure. Plaintiff presented Lee's request to Cole for chain of command approval, but Defendant refused to authorize a permanent pay increase for Lee without also implementing one for Rogers. Instead, Lee's additional contributions were recognized only through a temporary Additional Duty Pay stipend, which was approved through the proper chain of command including Cole, Boyce, and HR. Defendant's refusal to authorize a permanent pay adjustment for Lee without tying it to a corresponding adjustment for Rogers, an employee actively resisting Plaintiff's authority, further constrained Plaintiff's ability to manage, retain, and reward his staff, directly undermining his effectiveness and authority as Director.

25.     On July 10, 2025, Plaintiff received notification from Mayhan that Rogers had filed an HR complaint against him. In his complaint, Rogers admitted that he had been challenging Plaintiff's promotion and had concerns regarding Plaintiff's qualifications. Rogers also filed a complaint against Cole requesting that Plaintiff be removed from the role of Director.

26.     Plaintiff met with HR on July 15, 2025, provided a written response and supporting documents, and expressly informed Mayhan that Rogers' hostility and concerns regarding Plaintiff's qualifications was a pretext for discriminating against Plaintiff's race. Plaintiff stated that but for Plaintiff's race, Rogers would not behave in such a hostile manner toward him as a result of this promotion, and but for his race, Plaintiff as Director would not be required to be continuously subjected to Rogers' insubordination without recourse.

27. On July 24, 2025, Mayhan informed Plaintiff that Rogers' complaint had been found unsubstantiated and that Rogers was remorseful. When Plaintiff requested creating a formal plan for managing the path forward with Rogers, HR stated that they had provided "tips and pointers" to Cole. When Plaintiff spoke with Cole, Cole confirmed that HR had not actually provided any tips or pointers to him.

28. Rogers returned from FMLA leave on August 25, 2025, and resumed insubordinate behavior, including freely taking full workdays to engage in extracurricular studies, failing to share in departmental workload, and making charges on a corporate card without Plaintiff's advance notification or approval as is customary. Plaintiff was informed by Cole to allow the charges.

29. Despite Plaintiff setting and reiterating expectations on May 27, 2025, June 6, 2025, and September 9, 2025, Rogers' insubordination continued. Plaintiff reported this to Cole and Mayhan on September 17, 2025, and requested to issue corrective action. On this day Plaintiff was given consent by Mayhan to draft a corrective action form and submit it to HR for her and CHRO Beaver to approve. On this same day, Plaintiff completed the form and returned it to HR.

30. On September 23, 2025, Plaintiff sent a follow-up email regarding the corrective action form but received no response. On September 29, 2025, because weeks passed without a response and because Defendant's personnel policy instructs employees to reach out to their unit's Vice President, Plaintiff requested a meeting with Vice President Jessica Boyce but was denied by her and was redirected to Reid Beaver. Boyce informed Plaintiff that she would set up a meeting between Plaintiff and Beaver. Beaver and Plaintiff met on October 1, 2025. Beaver verbally agreed to approve and return the corrective action form within a day. He did not do so.

31.     On October 8, 2025, Plaintiff received an email from Mayhan following up regarding Rogers' behavior and the status of the corrective action form. In response, Plaintiff expressed that he never received it back with approval from HR and that Defendant's ongoing failure to support his authority as Director appeared to reflect bias favoring Rogers. In response, Beaver replied that "delays happen," accused Plaintiff of not being an "appropriate partner," and instructed Plaintiff to "confront Shane." Beaver's recommendation to "confront Shane" was inconsistent with Defendant's own written personnel policies and inappropriate given Rogers' history of outbursts and hostility.

32.     On October 10, 2025, Plaintiff met with Boyce and then Chief of Staff Mark Short. Both acknowledged that Rogers' behavior needed correction and that HR's handling had been inadequate.

33.     Approval of the corrective action for Rogers was not granted until October 14, 2025, twenty-seven (27) days after Plaintiff submitted the form on September 17, 2025. Mayhan acknowledged to Plaintiff that the extensive delay for approval of the corrective action would lessen the effectiveness and enforceability of the corrective action.

34.     On October 15, 2025, one day after approval for the corrective action was granted to Plaintiff, Plaintiff was informed by Mayhan that Rogers had submitted a request for accommodation under the Americans with Disabilities Act. As a result, Plaintiff refrained from proceeding with the corrective action. Regardless of the origin of Rogers' accommodation request, the practical effect of the sequence, in which corrective action was approved after a 27-day delay and was immediately followed by an accommodation request that prevented its implementation, was to eliminate any meaningful opportunity for Plaintiff to exercise

disciplinary authority over Rogers. This sequence contributed materially to the conditions underlying Plaintiff's constructive discharge.

35.     In or about early November 2025, Defendant relocated the Enterprise Risk Management department from its dedicated office suite to cubicle workspaces in a different building. The reason provided to Plaintiff for the relocation was Rogers' conduct. The relocation of the entire Enterprise Risk Management department, rather than the relocation or discipline of Rogers whose conduct was identified as the reason for the move, constituted a tangible degradation of Plaintiff's working conditions and a concrete manifestation of Defendant's refusal to hold Rogers accountable. The decision to uproot Plaintiff's department rather than address Rogers' conduct reflects the same pattern of institutional choices that systematically undermined Plaintiff's authority as Director. This relocation constitutes a discrete adverse action incorporated in Plaintiff's race discrimination claim and as a further element of the hostile work environment Defendant created and maintained.

## D. Retaliation Following EEOC Right-to-Sue Notice

36.     On January 27, 2026, Plaintiff received a Notice of Right to Sue from the EEOC.

37.     On February 12, 2026, sixteen days after Plaintiff received his EEOC Notice of Right to Sue, CHRO Reid Beaver sent a written communication to Plaintiff's supervisor Bruce Cole, with Vice President Jessica Boyce and HR Representative Cynthia Mayhan copied, under the subject line "Employee Issue." In that communication, Beaver relayed complaints he had received regarding Plaintiff's department and explicitly stated: "You might want to wait a few days before doing so because I encouraged others to come forward with their concerns, either to me or you." The complaints relayed by Beaver targeted Plaintiff's Black employees by name and description, while explicitly excluding Rogers, whom Beaver acknowledged "seems like he is working and

has things to do." Beaver further noted that the ERM team's workplace dynamic "could be evidence of retaliation based on his prior claim," referring to Rogers' prior HR complaint against Plaintiff, thereby actively constructing a counter-retaliation narrative against Plaintiff within the same communication in which he was soliciting additional complaints against Plaintiff's department. Boyce received this communication and took no corrective action. The communication reflects a coordinated effort by Defendant's senior leadership to aggregate adverse information against Plaintiff and his Black employees in the immediate wake of Plaintiff's protected activity.

38.  On the morning of February 17, 2026, and within twenty-one (21) days of the issuance of Plaintiff's right-to-sue notice, Cole requested a one-on-one with Plaintiff to coach Plaintiff on the College's Telecommute Policy and stated that HR raised concerns about Lee's Additional Duty Pay, compensation that had been approved through the proper chain of command including Cole, Boyce, and Beaver. During this one-on-one, Plaintiff was presented with vague and generalized complaint allegations from unspecified sources. Cole then requested documented proof of Lee's productivity. The targeting of Lee's additional duty pay in the immediate wake of Plaintiff's Right to Sue notice reflects the retaliatory nature of the scrutiny directed at Plaintiff's department and Plaintiff's exercise of his supervisory authority.

39.  On February 18, 2026, Plaintiff provided Cole with the requested productivity documentation, but also raised concerns in email to Beaver, Cole, and Boyce regarding the nature of the complaints and requests. Plaintiff stated that the nature and wave of the complaints appeared targeted, retaliatory, and discriminatory.

40.     On February 26, 2026, Plaintiff was required to meet with Cole and Beaver. During this meeting, Beaver presented new complaints against Plaintiff, stated Plaintiff was "not starting off on good foot," accused Plaintiff of failing to follow College policies, procedures, and practices, and when Plaintiff asked for specifics, Beaver stated that the practices "are not written and vary depending on the person."

41.     During the February 26 meeting, Beaver informed Plaintiff that Rogers, who is named in Plaintiff's EEOC charge, had filed yet another HR complaint against Plaintiff. Beaver refused to provide Plaintiff with details about the allegations or a timeline for investigation.

42.     The escalation of adverse employment actions beginning February 12, 2026, through February 26, 2026, occurred within thirty (30) days of the issuance of Plaintiff's EEOC Notice of Right to Sue and constitute unlawful retaliation for Plaintiff's protected activity.

### E. Constructive Discharge

43.     By February 26, 2026, Plaintiff faced a convergence of conditions that materially impaired his ability to perform his role as Director, including Defendant's repeated refusal and delay to authorize or support disciplinary action against a White subordinate, the loss of dedicated departmental workspace, and the initiation of complaints encouraged and aggregated by the CHRO. Plaintiff was also confronted with vague allegations based on unwritten and inconsistently applied standards and threatened with escalating investigations. These conditions, taken together, substantially diminished Plaintiff's authority and effectiveness, and created a working environment in which a reasonable person in Plaintiff's position would have felt compelled to resign. Plaintiff had no reasonable expectation that these conditions would improve. The conduct was not that of a rogue subordinate or a mid-level administrator acting outside institutional sanction; it was directed and ratified by the Chief Human Resources Officer

himself, the very official responsible for investigating discrimination complaints and enforcing personnel policy at CPCC. When the institutional actor responsible for remediation is the same actor directing the adverse conduct, no internal path to relief exists and continued employment becomes objectively unreasonable. Plaintiff resigned effective March 13, 2026, because of these conditions.

44.    On March 5, 2026, Plaintiff submitted his resignation to Defendant with an effective date of March 13, 2026. Plaintiff was placed on paid administrative leave for the period between March 6 through March 13, 2026.

45.    This resignation constitutes a constructive discharge under Title VII and 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983. Plaintiff's continued employment with Defendant became objectively intolerable as a direct and proximate result of Defendant's sustained discriminatory, hostile, and retaliatory conduct because of Plaintiff's protected activities.

## V. CLAIMS FOR RELIEF

## COUNT I: RETALIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3

46.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

47.    Plaintiff engaged in protected activity under Title VII by: (a) making internal complaints to HR regarding a hostile work environment and race discrimination; (b) expressly identifying the racial pretext of Rogers' conduct; (c) filing a charge of discrimination and retaliation with the EEOC; and (d) questioning the targeted, retaliatory, and discriminatory nature and wave of the complaints received after Plaintiff received the EEOC Notice of Right to Sue.

48.     Within thirty (30) days following Plaintiff's Notice of Right to Sue from the EEOC, Defendant subjected Plaintiff to adverse employment actions including but not limited to: the presentation of new, vague, and unsubstantiated complaints against Plaintiff and his Black employees; coaching sessions targeting Plaintiff's newly alleged incompliance with workplace policies; and the facilitation of a second retaliatory HR complaint by Rogers.

49.     The temporal proximity between Plaintiff's January 27, 2026, Notice of Right to Sue and the adverse actions commencing February 12, 2026, establishes a causal connection between Plaintiff's protected activity and the retaliation.

50.     The culmination of Defendant's retaliatory conduct was the constructive discharge of Plaintiff. By February 26, 2026, the conditions of Plaintiff's employment had become objectively intolerable as a direct and proximate result of Defendant's retaliatory conduct, including the escalation of vague and unsubstantiated complaints encouraged and aggregated by the CHRO, the repeated undermining of Plaintiff's authority, and the threat of further adverse employment actions based on unwritten and inconsistently applied standards. A reasonable person in Plaintiff's position would have felt compelled to resign under these circumstances. Plaintiff's resignation, effective March 13, 2026, constitutes a constructive discharge and is the most severe adverse employment action Plaintiff suffered as a result of Defendant's retaliation.

51.     As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, emotional distress, and other compensatory damages.

## COUNT II: RACE DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2

52. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

53. Defendant discriminated against Plaintiff on the basis of his race in the terms and conditions of his employment by, among other things: (a) conditioning Plaintiff's promotion on an "Interim" designation not applied to non-Black employees and not customary practice for the College; (b) systematically failing to support Plaintiff's authority as Director over a White subordinate; and (c) subjecting Plaintiff to disparate treatment in its application of personnel policies and disciplinary procedures.

54. Upon information and belief, similarly situated White employees in director and supervisory roles were not subjected to the same terms and conditions imposed on Plaintiff, including the imposition of an interim designation not customary for the College, the denial or delay of corrective action authorization against insubordinate subordinates, and the restriction of staffing authority during periods of departmental vacancy. Plaintiff expects that discovery will establish the identities and treatment of comparator employees with specificity.

55. The cumulative effect of Defendant's discriminatory conduct in the terms and conditions of Plaintiff's employment ultimately rendered those conditions objectively intolerable. The systematic refusal to support Plaintiff's authority over a White subordinate, the imposition of conditions on Plaintiff's promotion not applied to White employees, the disparate handling of complaints, and the ongoing failure to enforce workplace standards on Plaintiff's behalf left Plaintiff with no reasonable alternative but to resign. Plaintiff's resignation effective March 13, 2026, constitutes a constructive discharge that is the direct and proximate result of Defendant's racially discriminatory conduct, and represents the most severe term and condition of employment to which Plaintiff was subjected.

56.     As a direct and proximate result of Defendant's disparate and discriminatory conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, emotional distress, and other compensatory damages.

## COUNT III: HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2

57.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58.     Plaintiff was subjected to unwelcome conduct, including repeated hostility, insubordination, and obstruction by a White subordinate, Shane Rogers, following Plaintiff's promotion to Director.

59.     Rogers openly challenged Plaintiff's selection for the Director role and, as a pretext for discrimination against Plaintiff's race, Rogers repeatedly expressed concerns regarding Plaintiff's qualifications despite Rogers having prior knowledge of Plaintiff's more than twelve (12) years of experience and Master of Business Administration degree. Rogers had previously admitted that Plaintiff had built positive workplace relationships even with Rogers within Central Piedmont Community College, but Rogers continued to engage in hostile conduct towards Plaintiff after Plaintiff, a Black man, was promoted over him.

60.     Rogers' conduct is not consistent with the behavior of a disappointed internal candidate who lost a promotion on the merits. Rogers had full prior knowledge of Plaintiff's qualifications and experience, having served on Plaintiff's interview panel for the Risk Management Analyst role, and had previously acknowledged Plaintiff's positive workplace relationships and professional contributions. There was no pre-existing personal conflict between Rogers and Plaintiff prior to Plaintiff's promotion. The immediate, sustained, and escalating nature of

Rogers' hostility, beginning the day of the promotion announcement and continuing unabated for months, is consistent with racial animus toward a Black supervisor and is not explained by any race-neutral reason in the record. The inference of racial motivation is further supported by Rogers' use of Plaintiff's qualifications as a stated basis for opposition, a pretext Rogers knew to be false given his firsthand knowledge of Plaintiff's more than twelve years of professional experience and graduate degree.

61.     Defendant knew or should have known of the hostile conduct through Plaintiff's repeated complaints beginning May 2025 and failed to take prompt, effective remedial action. Instead, Defendant's response enabled the continuation of the conduct and contributed to the hostile work environment.

62.     The conduct was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. The severity and pervasiveness of the hostile environment is established not by Rogers' conduct alone, but by the convergence of Rogers' sustained insubordination and hostility with Defendant's institutional response to it. Defendant had actual notice of Rogers' conduct beginning in May 2025 and took no prompt or effective remedial action for months. Defendant repeatedly redirected, delayed, and denied Plaintiff the institutional support his role required. Defendant withheld corrective action for twenty-seven (27) days after Plaintiff submitted the requisite form, and the sequence of delayed approval followed immediately by an accommodation request further prevented Plaintiff from implementing discipline. The hostile environment was therefore not merely the product of a subordinate's misconduct; it was actively sustained and amplified by Defendant's own deliberate institutional failures. A reasonable person subjected to these cumulative conditions would find the work environment hostile and abusive.

## COUNT IV: RACE DISCRIMINATION, RETALIATION, AND CONSTRUCTIVE DISCHARGE IN VIOLATION OF 42 U.S.C. § 1981 AND 42 U.S.C. § 1983

63.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

64.  42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983 provides legal remedy to all persons for violations of their constitutional or federal rights. Plaintiff's employment relationship with Defendant, including his promotion to Director of Enterprise Risk Management, constitutes a contractual relationship. Because Defendant is a public institution and state actor, Plaintiff asserts his §1981 claims through 42 U.S.C. §1983, which provides the cause of action for enforcement of §1981 rights against state and local government entities. Plaintiff was denied the enjoyment of his employment contract in a manner not imposed on similarly situated White employees.

65.  Defendant acted with reckless indifference to Plaintiff's federally protected rights. Defendant's Chief Human Resources Officer, who is an attorney, participated in the discriminatory and retaliatory conduct described herein.

66.  The discriminatory and retaliatory conduct described herein, including the refusal and delay to authorize corrective action against a White subordinate, the imposition of restrictions on Plaintiff's authority as Director, and the escalation of adverse scrutiny following Plaintiff's protected activity, was taken, directed, or ratified by Chief Human Resources Officer Reid Beaver and other senior leadership acting within their final policymaking authority over personnel matters. As CHRO, Beaver exercised final authority over employee discipline, complaint investigation, and the administration of personnel policies at CPCC. No higher institutional authority reviewed or was required to approve the personnel decisions Beaver made

or directed with respect to Plaintiff. His actions therefore reflect official policy and custom attributable to Defendant.

67.     At all relevant times, Chief Human Resources Officer Reid Beaver possessed final policymaking authority with respect to the administration of personnel policies, the investigation and resolution of employee complaints, and the application of workplace conduct standards at CPCC. As CHRO, Beaver's decisions regarding employee discipline, complaint investigation, and HR policy enforcement were not subject to routine review or reversal by a higher institutional authority in the ordinary course. Bruce Cole and Jessica Boyce participated in and ratified the conduct described herein within their respective supervisory capacities. Boyce received Beaver's February 12, 2026, communication directing delayed response and soliciting additional complaints against Plaintiff and took no corrective action, making her a knowing participant in the retaliatory conduct. Their actions and omissions, taken together with Beaver's direction, constitute the official policy and custom of Defendant for purposes of 42 U.S.C. § 1983.

68.     Plaintiff engaged in protected activity by complaining internally about race discrimination and by filing a charge of discrimination with the EEOC. Defendant retaliated against Plaintiff for engaging in protected activity and subjected Plaintiff to the adverse employment actions described herein, including but not limited to the escalating scrutiny and adverse treatment following Plaintiff's January 27, 2026, EEOC Notice of Right to Sue. Plaintiff asserts under 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983 that his federally protected rights were violated by the Defendant.

69.     Viewed collectively, Defendant's actions reflect a pattern in which Plaintiff's authority was limited while complaints against Plaintiff were later encouraged, aggregated, and relied upon following Plaintiff's protected activity. The conditions underlying those allegations against Plaintiff and his department were, in part, the result of Defendant's own decisions, including the alteration of the work environment and the failure to permit timely disciplinary action.

70.     The sequence of events supports a reasonable inference that Defendant's actions were pretextual and that Plaintiff was subjected to unlawful retaliation and disparate treatment in the terms and conditions of his employment.

71.     Unlike Title VII, 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983 imposes no cap on compensatory damages. As a direct and proximate result of Defendant's violations of Plaintiff's federally protected rights, Plaintiff has suffered and continues to suffer lost wages, lost benefits, lost career advancement opportunities, emotional distress, damage to professional reputation, and other compensatory damages in amounts to be determined at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and award the following relief:

a.      A declaration that Defendant's conduct violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981 through the vehicle of 42 U.S.C. §1983;

b.      Back pay, including lost wages and benefits, from the date of constructive discharge through the date of judgment;

c.      Compensatory damages for emotional distress, pain and suffering, and loss of enjoyment of life in an amount to be determined at trial;

d.      An award of front pay and future lost earnings sufficient to compensate Plaintiff for the loss of his position and career trajectory in an amount to be determined at trial;

e.      A permanent injunction requiring Defendant to implement and enforce non-discriminatory policies and practices governing the handling of employee complaints of race discrimination, the administration of supervisory authority, and the application of personnel policies without regard to the race of the employee or the employee's subordinates;

f.      An award of costs and attorney's fees pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988, which authorizes fee awards in actions brought under 42 U.S.C. § 1983;

g.      Pre- and post-judgment interest;

h.      Expungement of any adverse employment records generated as a result of Defendant's unlawful conduct; and

i.      Such other and further relief as this Court deems just and proper, including any additional equitable relief this Court finds appropriate.

## VII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Joseph Hurst, Pro Se

PO Box 78661

Charlotte, NC 28271

815-319-2669

Jshurst00@yahoo.com

Date: 04 -23-2026

## EXHIBIT A

EEOC Notice of Right to Sue

(Attached)